**FILED**
**Mar 08, 2021**
**03:51 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MEMPHIS

| | | |
|---|---|---|
| **CARLETTAS MCBRIDE,** | ) | **Docket No. 2018-08-0204** |
| **Employee,** | ) | |
| **v.** | ) | |
| **PEOPLEASE CORP.,** | ) | **State File No. 57231-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| **NATIONAL INTERSTATE INS. CO.,** | ) | **Judge Amber E. Luttrell** |
| **Insurance Carrier.** | ) | |

## COMPENSATION ORDER

The Court held a Compensation Hearing on Mr. McBride's claim for injuries to his shoulder, neck, and back. The issues are whether his injuries are compensable, and if so, his entitlement to permanent partial disability benefits. For the reasons below, the Court holds that only Mr. McBride's neck injury is compensable, and he is entitled to permanent partial disability benefits, including an increased award, totaling $33,218.72.

### History of Claim

Mr. McBride was a truck driver for Peoplease. On July 23, 2015, he sustained a motor vehicle accident and alleged injuries to his right shoulder, neck, and low back. Mr. McBride testified he was traveling south when a north-bound 18-wheeler lost its rear trailer tire, which hit his truck head-on. Mr. McBride stated the impact caught him off guard and he had to "wrestle" the truck to regain control and maneuver it safely to the side of the road.[1]

Peoplease sent Mr. McBride to urgent care and then the emergency room for treatment.

---

[1] Peoplease sought to cross-examine Mr. McBride using a police report from the officer at the scene. Mr. McBride's counsel objected on grounds that the report is inadmissible. The Court took the objection under advisement. Upon consideration, the Court sustains the objection because the police report and its contents are hearsay for which no exception applies under Tennessee Rule of Evidence 803.

1

At the urgent care clinic, Mr. McBride completed an intake sheet explaining he was "driving I-55 south when a north-bound truck lost its rim and tire that hit me." Five days later, Mr. McBride returned there and completed another intake sheet. He again reported that "a semi-truck lost its tire on I-55 that hit me head-on."

Peoplease authorized treatment with Dr. Thomas Giel, an orthopedic specialist, for Mr. McBride's shoulder and Dr. Fereidoon Parsioon, a neurosurgeon, for his neck and back, both of whom were panel-selected physicians.[2] Mr. McBride later saw Dr. Samuel Chung for an independent medical evaluation. The parties introduced the deposition testimony of these physicians.[3]

*Dr. Giel*

Mr. McBride saw Dr. Giel for his upper extremity complaints over the course of one and one-half years. Dr. Giel initially diagnosed rotator cuff syndrome and treated him conservatively. He stated Mr. McBride's symptoms were primarily related to his accident.

Later, however, Dr. Giel ordered a shoulder MRI that showed degenerative changes, biceps tendon inflammation and a partial thickness rotator cuff tear. He believed those findings were not caused by Mr. McBride's accident. He stated, "most of those are probably related to his overall shoulder wear and tear. [Mr. McBride's] got significant arthritis."

Over time, Dr. Giel concluded that Mr. McBride's upper extremity complaints were coming from a "fairly significant neck injury" and not the shoulder. He reached that conclusion because "on multiple times I would see him, . . .he'd have a normal or near normal shoulder exam." His neurologic exam in March 2016 showed pain and weakness in his right hand and right triceps. Based on these findings, Dr. Giel referred Mr. McBride to a spine specialist. He also deferred any causation opinion regarding Mr. McBride's cervical injury to the spine surgeon.

On April 5, 2017, Dr. Giel concluded he had nothing further to offer from a shoulder standpoint since Mr. McBride's neck was the primary source of his symptoms. He placed him at maximum medical improvement and assigned no permanent impairment.

---

[2] Mr. McBride first sought treatment with a neurologist for complaints of dizziness and headaches following the accident.

[3] Dr. Giel is a board-certified orthopedic surgeon who specializes in sports medicine. Sixty-percent of his practice consists of treating shoulder injuries. Dr. Parsioon is a general neurosurgeon who is not board-certified. He passed his written board but not the oral boards. He is certified in independent medical evaluations by the American Board of Independent Medical Evaluations. Dr. Chung is a board-certified physical medicine rehabilitation specialist and is certified in performing independent medical evaluations. Although their qualifications vary, these physicians are all fully competent to offer opinions on causation and impairment.

2

Dr. Giel reviewed Dr. Chung's report and disagreed with his impairment opinion for the shoulder based on motion loss. He disagreed because he did not believe Mr. McBride's symptoms were related to the shoulder. Dr. Giel further challenged Dr. Chung's method because Dr. Giel measured Mr. McBride's range of motion at every visit and stated, "all of my visits had much better range of motion" than Dr. Chung's measurements on one visit. He further commented that partial thickness rotator cuff tears "almost never cause loss of motion." He stated, "loss of motion would much more likely be related to arthritis. However, I never documented any loss of motion."

Dr. Giel also testified regarding restrictions he assigned. On March 31, 2016, Dr. Giel placed various work restrictions in March 2016, but he did not mention that Mr. McBride could not drive a truck. Dr. Giel reviewed a letter Peoplease sent to Mr. McBride with a light-duty assignment, and Dr. Giel agreed the job offered complied with the restrictions. However, at Mr. McBride's next visit with Dr. Giel on May 5, Dr. Giel clarified that at the March visit he was also taking him "off DOT driving." Dr. Giel testified he was mistaken in the March work status note and intended to restrict Mr. McBride from DOT driving because of his cervical problems. Dr. Giel concluded that, had his March 31 restrictions been correct, Mr. McBride would not have been able to perform the light-duty job because it required driving.

*Dr. Parsioon*

Mr. McBride saw Dr. Parsioon for his neck and back. Dr. Parsioon testified he understood from Mr. McBride's history that his truck was hit head-on by another truck, which was the foundation for his opinions. Mr. McBride reported to Dr. Parsioon constant neck and back pain with tingling and sharp pain in both shoulders and his right wrist. Dr. Parsioon testified he read Mr. McBride's records from Baptist, the neurologist, the emergency room, and the diagnostic studies, as well as Dr. Giel's records. After reviewing a cervical MRI and EMG study, Dr. Parsioon took x-rays and ordered a lumbar MRI.

Regarding the neck, Dr. Parsioon explained the cervical MRI showed a large ruptured disc at C5-6. He offered a cervical epidural block, but Mr. McBride declined. Dr. Parsioon determined that all conservative treatment options had been exhausted and recommended surgery. Mr. McBride was fearful to undergo the procedure and declined. Dr. Parsioon then referred him to pain management, kept him off work until he could see a pain management physician, and placed him at maximum medical improvement on March 9, 2017. At that time, Dr. Parsioon believed that Mr. McBride's work accident caused the cervical disc herniation. Dr. Parsioon concluded that Mr. McBride has a significant cervical disc injury and still requires surgery.

As for his back, Dr. Parsioon testified the lumbar MRI showed a right-sided L5-S1 ruptured disc with foraminal stenosis, which he noted was on the opposite side of Mr. McBride's left lower-extremity complaints. He stated, "there is no reason that a right sided ruptured disc in any part of the spine would cause pain in the opposite extremity."

3

Therefore, he concluded the right-sided disc was not the cause of Mr. McBride's pain in his left lower extremity. Because the MRI provided no explanation for his left lower-extremity pain, Dr. Parsioon ordered an EMG, which was normal: the study revealed no radiculopathy or neuropathy. He concluded that Mr. McBride did not require back surgery.

Dr. Parsioon further testified regarding his impairment opinion. For the neck, he assigned eleven percent to the body for the C5-6 ruptured disc based on Table 17-2, class two of the 6th Edition of the AMA Guides. As for the back, Dr. Parsioon assigned no impairment because he found the disc herniation was on the opposite side of his pain, so the herniation found on the MRI was "basically asymptomatic." He stated his complaints were non-verifiable. Dr. Parsioon explained that studies of the general population show that forty-percent of people have an asymptomatic ruptured disc in the spine. Dr. Parsioon further testified that herniations can be caused by many reasons, such as "doing nothing, waking up in the morning and having a ruptured disc," sneezing, coughing, trauma, falls, motor vehicle accidents and lifting injuries.

Two years after Dr. Parsioon released Mr. McBride at maximum medical improvement, Peoplease sent him back to Dr. Parsioon to review a functional capacity evaluation and the records, and to "give [his] final opinion." Dr. Parsioon testified he read the histories of Mr. McBride's accident in his records and an excerpt of Mr. McBride's deposition testimony regarding the mechanism of injury. Based on this information, Dr. Parsioon changed his causation opinion and withdrew his eleven-percent rating for the cervical injury. He said that Mr. McBride told him "that another truck hit him head on," which was inconsistent with the history Mr. McBride gave to the first provider he saw at the urgent care clinic, and others, where he reported that the tire of another truck hit him. Dr. Parsioon stated, "that's not the type of injury that causes all of this significant ruptured disc and problems." Dr. Parsioon also pointed to the history from the emergency room, which stated Mr. McBride "hit a trailer from another truck head on."

Next, Dr. Parsioon noted a record from Mr. McBride's family physician from ten days before the accident, which stated Mr. McBride was there for blood pressure, muscle spasms in both arms, stiffness in his hands and to review his last labs. According to the record, Mr. McBride's musculoskeletal and cervical exams were normal. The physician diagnosed hypertension and psoriasis and did not treat the muscle spasms or stiffness. However, Dr. Parsioon testified the report of hand or arm spasms "would also go along with having neck problems." On cross-exam, Dr. Parsioon acknowledged that stiffness was not associated with radiculopathy. Further, he was unaware that Mr. McBride successfully passed two Department of Transportation physicals shortly before his injury.

### Dr. Chung

Mr. McBride saw Dr. Chung once for an independent medical examination of his right shoulder, neck, and back. Dr. Chung reviewed his treatment records and imaging

4

studies. After a history and exam, he diagnosed Mr. McBride with residuals from a right-shoulder injury and back injury with ongoing symptomatology and residuals from a cervical injury with ongoing radiculopathy.

Regarding causation, Dr. Chung testified within a reasonable degree of medical certainty that Mr. McBride's motor vehicle accident caused his injuries. He stated he considered any other potential causes and concluded there were none based on Mr. McBride's history and records. Specifically, Dr. Chung stated that, from his records review and assessment, he did not see any evidence of a preexisting injury or suggestion that Mr. McBride was symptomatic in his shoulder, neck, or low back before the accident. Dr. Chung assigned impairment ratings for each condition.

For the shoulder, Dr. Chung assigned an eight-percent impairment based on range of motion loss. He assigned a fifteen-percent impairment for the neck based on spinal stenosis at multiple levels. For the low back, Dr. Chung assigned seven-percent impairment, stating that Mr. McBride's diagnosis was "most consistent with lumbar stenosis at a single or multiple levels. However, Dr. Chung based his rating on a different diagnosis section, a single-level disc herniation, on cross-examination. When questioned about Dr. Parsioon's zero-percent rating for the back, Dr. Chung agreed that Dr. Parsioon's impairment opinion was supported by the Guides based on Dr. Parsioon's findings of a herniation without clinically-correlating radicular symptoms. Finally, Dr. Chung testified the total impairment for the three conditions is twenty-seven percent to the body.[4]

*Additional Hearing Testimony*

Mr. McBride testified he continues to have pain in his neck and back, tingling in his hands and some headaches and dizziness. He stated he hurts constantly and takes medication to "try and deal with it." He had none of these problems before his work injury and never sought treatment for his shoulder, neck or back before the injury. In fact, Mr. McBride testified he passed a Department of Transportation physical a couple of days before the injury.

Mr. McBride acknowledged seeing his family doctor ten days before the injury but did not recall reporting any complaints of spasms in his arms or stiffness in his hands. The doctor did not treat him for spasms or stiffness; he merely refilled his blood pressure medication.

Tracy Smith, operations manager for the trucking company, testified that he knew Mr. McBride, characterized him as a good worker, and he had no problem driving a truck or passing DOT physicals in the three years before the work injury. He understood the

---

[4] Dr. Chung stated he miscalculated when using the combined values chart in his report when he gave a total impairment of twenty-three percent.

injury happened due a tire coming off another 18-wheeler and hitting Mr. McBride's truck. Mr. Smith saw photos of the damaged truck, which he considered was "messed up pretty good."

Mr. Smith and Mr. McBride testified regarding their phone conversations about Dr. Giel's light-duty restriction in March 2016. Mr. Smith called Mr. McBride to talk about the restrictions and returning to work. Mr. McBride expressed concern about his ability to safely perform his job duties and mentioned "maybe he should resign." Based on that conversation, Mr. Smith started the resignation process. Mr. McBride called back a few minutes later and said he had made a mistake, did not want to resign, and wanted to see the doctor again. Mr. Smith informed him that he had already accepted his resignation based on his safety concerns.

On cross-examination, Mr. Smith agreed that if Dr. Giel's position were that Mr. McBride could not drive a truck, then he could not have returned to work because he would not have been able to do the job. He further agreed that if Mr. McBride had been unable to maintain his CDL since his injury, he could not work as a truck driver.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, Mr. McBride must prove by a preponderance of the evidence that he is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2020).

### Compensability and Impairment

To prove a compensable injury, Mr. McBride must show "to a reasonable degree of medical certainty that [the injury] contributed more than fifty percent (50%) in causing the death, disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). The term "reasonable degree of medical certainty" means that "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(14)(D). Thus, causation generally must be shown by expert medical testimony. The Court considered the competing medical opinions regarding each alleged injury.

"When faced with conflicting medical testimony, the Court must use its discretion in accepting one expert opinion over another and, in so doing, may consider which opinion contains the more probable explanation." *Sanker v. Nacarato Trucks, Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *12 (July 6, 2016).

### Right Shoulder

Dr. Giel and Dr. Chung testified regarding Mr. McBride's shoulder.

6

Dr. Giel treated Mr. McBride conservatively over approximately one and a half years for his upper extremity complaints. He determined the shoulder MRI findings were unrelated to Mr. McBride's accident and were more consistent with a lifting injury or overall shoulder wear and tear. He ultimately concluded that Mr. McBride's complaints were not coming from the shoulder but from a significant neck injury and he has no impairment related to the shoulder. As the panel-selected physician, Dr. Giel's causation opinion is afforded a rebuttable presumption of correctness. *See* Tenn. Code Ann. § 50-6-102(14)(E).

Dr. Chung agreed that Mr. McBride had a severe preexisting degenerative condition in his shoulder. He even admitted that if no accident had occurred and he saw the MRI, he would have attributed the findings to a chronic degenerative condition. However, based on Mr. McBride's history of an accident and finding of a partial thickness tear on the MRI, he believed the accident "more likely than not caused the problem."

In analyzing the conflicting opinions, the Court finds Dr. Giel's testimony was more convincing and offered the most probable explanation for Mr. McBride's ongoing upper-extremity symptoms−that his symptoms stemmed from his cervical disc injury and *not* the shoulder. Dr. Giel is a shoulder specialist who saw Mr. McBride over a year and found no shoulder injury responsible for Mr. McBride's complaints. Dr. Chung's testimony consisted of a mere difference of opinion and was thus insufficient to overcome the presumption of correctness afforded Dr. Giel's opinion. Accordingly, the Court holds Mr. McBride did not sustain a compensable shoulder injury.

<u>Neck</u>

The Court next considers Mr. McBride's testimony and the competing opinions of Dr. Parsioon and Dr. Chung regarding the alleged neck injury. Peoplease relied on Dr. Parsioon's revised opinion that his cervical disc herniation was unrelated to the work accident based on his clarified understanding of the accident. As the authorized treating physician, Dr. Parsioon's causation opinion is afforded a rebuttable presumption of correctness. The issue is whether Mr. McBride successfully rebutted the presumption by a preponderance of the evidence. The Court finds he did.

Mr. McBride's testimony and treatment records showed he consistently reported neck pain and radicular symptoms to his providers, beginning immediately after his work injury. He testified he had no prior neck injuries or treatment before this accident. Peoplease argued, through Dr. Parsioon, that Mr. McBride's family physician's record from ten days before the injury suggested a preexisting cervical problem. However, Mr. McBride did not recall reporting spasms or stiffness and saw the doctor for high blood pressure. Notably, the record showed his cervical exam was normal, and the doctor diagnosed and treated high blood pressure and psoriasis. Mr. McBride further testified, without contradiction, that he had just passed a DOT physical days before his injury. The

7

Court credits Mr. McBride's testimony and finds no persuasive proof of any preexisting cervical injury.

The Court finds Mr. McBride credible. His testimony was calm, self-assured, confident, forthcoming, reasonable, and honest. *See Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility).

In changing his causation opinion, Dr. Parsioon suggested Mr. McBride misled him and others regarding the severity of the accident. Dr. Parsioon stated the injury was minor and not the cause of his ruptured disc and problems.

Considering the entirety of the records, the Court finds the histories of the accident were largely consistent with some discrepancies and finds Mr. McBride did not intentionally mislead Dr. Parsioon or any provider regarding the accident. His intake sheets at the urgent care clinic on two separate days were consistent with his testimony of how his injury occurred. In fact, the only providers whose histories were largely inaccurate were the emergency room and Dr. Parsioon. These differences in their records are likely attributable to mistake or misunderstanding.

Mr. McBride argued, and the Court agrees, that Dr. Parsioon's revised causation opinion for the cervical injury is problematic for two reasons. First, Dr. Parsioon testified he changed his opinion after reviewing records suggesting the accident was different than reported to him. However, he reviewed the same records when he began treating Mr. McBride for what he initially believed was work-related. Second, Dr. Parsioon decided Mr. McBride's account that an 18-wheeler tire hit him head-on, causing him to "wrestle" the truck to keep from losing control, was not severe enough to cause the disc herniation. Yet, he testified disc herniations can be caused by many non-traumatic events, including doing nothing. Dr. Parsioon did not reconcile this inconsistency; therefore, the Court is not persuaded by the basis for his revised opinion.

Dr. Chung testified that Mr. McBride's accident caused his cervical injury. He considered other potential causes and concluded there were none, based on his evaluation. Peoplease argued that Dr. Chung's testimony did not satisfy the statutory causation standard because he did not testify the cervical injury arose *primarily out of* the work injury. The Court agrees that Dr. Chung did not use the statutory language. However, the Appeals Board has stated,

> A physician does not have to couch his or her opinion in a rigid recitation of the statute, and that physicians need not use particular words or phrases included in the statute to establish the requisite medical proof to succeed at trial. What is necessary to succeed . . . is sufficient proof from which the trial court can conclude that the statutory requirements of an injury as defined in section 50-6-102(14) are satisfied.

*Panzarella v. Amazon.com, Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (May 15, 2017).

The Court finds Dr. Chung's testimony was sufficient to prove he believed Mr. McBride's accident was more likely than not the cause of his cervical injury, considering all causes. Based on his testimony, the medical proof, and Mr. McBride's testimony, the Court holds Mr. McBride overcame the presumption of correctness afforded Dr. Parsioon's causation opinion, and he sustained a compensable cervical injury at C5-6.

As for impairment, Dr. Parsioon initially assigned an eleven-percent rating under the AMA Guides for Mr. McBride's one-level C5-6 ruptured disc with unresolved radiculopathy. Dr. Chung assigned fifteen-percent impairment for spinal stenosis. Based on the holding that Mr. McBride sustained a compensable disc herniation at C5-6, the Court holds Mr. McBride did not overcome Dr. Parsioon's presumption of correctness on the rating issue. Thus, Mr. McBride retained an eleven-percent anatomic impairment for his cervical disc injury.

<u>Back</u>

Turning to the back, the Court again considered the competing opinions of Drs. Parsioon and Chung. The proof showed Mr. McBride reported left-sided back and leg pain; however, his symptoms were inconsistent with his MRI findings of a right-sided disc rupture. Dr. Parsioon said that a right-side ruptured disc would not cause pain in the opposite extremity. In addition, Mr. McBride's EMG of the left lower extremity was normal. Dr. Parsioon concluded Mr. McBride's left-sided complaints were non-verifiable, and the disc found on MRI was "basically asymptomatic." Accordingly, he assigned zero impairment under the AMA Guides for imaging studies of a herniation without clinically correlating radicular symptoms.

The Court finds Dr. Chung gave inconsistent testimony regarding Mr. McBride's diagnosis for his back as detailed above. Considering the totality of the proof, the Court credits Dr. Parsioon's testimony regarding Mr. McBride's back. Mr. McBride reported left-sided back and leg symptoms; however, Dr. Parsioon concluded his complaints were noncompatible with the diagnostic studies and non-verifiable, and he gave no diagnosis for his complaints. Thus, the Court holds Mr. McBride did not overcome Dr. Parsioon's opinion. He did not prove a compensable back injury.

*Permanent Partial Disability*

Because the Court holds Mr. McBride sustained a compensable neck injury, the Court turns to his entitlement to permanent partial disability benefits. The assessment of these benefits occurs at two different times.

The first assessment takes place once the treating physician places the injured employee at maximum medical improvement and assigns an impairment rating. Based on the above findings regarding Mr. McBride's permanent impairment for his neck, the Court finds he has an anatomic rating of eleven percent to the body, which entitles him to 49.5 weeks of benefits. At his stipulated compensation rate of $414.25, Mr. McBride's original award is $20,505.38. *See* Tenn. Code Ann. § 50-6-207(3)(A).

The second assessment occurs at the expiration of the initial compensation period. Based on the eleven-percent impairment and Mr. McBride's maximum medical improvement date for the neck injury of March 9, 2017, Mr. McBride's initial compensation period expired on February 18, 2018. At that time, Mr. McBride had not returned to work with any employer. He contended he qualifies for a resulting award and increased benefits. *See* Tenn. Code Ann. § 50-6-207(3)(B).

Peoplease countered that Mr. McBride is not eligible for increased benefits because he resigned. The Court disagrees.

Mr. McBride declined Peoplease's light-duty offer and resigned based on Dr. Giel's erroneous March 2016 restrictions and because he believed he could not safely drive. Dr. Giel clarified at Mr. McBride's next visit in May 2016 and in his deposition that Mr. McBride could not "DOT drive" dating back to March. Dr. Giel never removed his "no DOT driving" restriction, and Dr. Parsioon kept Mr. McBride off work. Mr. Smith testified Mr. McBride could not have worked for the trucking company if he were restricted from driving. Thus, the Court finds Mr. McBride resigned for reasons related to the work injury, and the only medical proof available suggests he was still unable to DOT drive at the expiration of his initial benefit period. Accordingly, he is entitled to increased benefits.

The parties agreed that the multipliers of 1.35 and 1.2 apply if the Court awarded increased benefits. Applying those multipliers, Mr. McBride's total permanent partial disability award is $33,218.72.

**IT IS THEREFORE, ORDERED** as follows:

1. Peoplease or its carrier shall pay permanent partial disability benefits to Mr. McBride in the amount of $33,218.72.

2. Mr. McBride shall receive future medical benefits under the statute for his cervical disc injury. Because Mr. McBride now resides in Murfreesboro, Illinois, Peoplease shall provide a new panel of neurosurgeons for Mr. McBride to select a new treating physician under 50-6-204(a)(3)(F).

3. Mr. McBride's counsel is entitled to a twenty-percent attorney's fee to be paid from his award. *See* Tenn. Code Ann. § 50-6-226(a)(1).

4.  Costs of $150.00 are assessed against Peoplease under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (August, 2019), to be paid within five days of this order becoming final. Peoplease shall file a statistical data form (SD2) within ten business days of the date of this order under Tennessee Code Annotated § 50-6-244.

5.  Unless appealed, this order shall become final thirty-days after issuance.

**ENTERED** March 8, 2021.

*Amber Luttrell*

**JUDGE AMBER E. LUTTRELL**
Court of Workers' Compensation Claims

*Appendix*

Exhibits

1.  Stipulations of the Parties
2.  Dr. Giel's Deposition
3.  Dr. Parsioon's Deposition
4.  Dr. Chung's Deposition[5]
5.  Medical Records Table of Contents (collective exhibit)
6.  Excerpts of Mr. McBride's deposition and discovery responses
7.  Employer's letter to Mr. McBride

Technical Record

1.  Petition for Benefit Determination
2.  Dispute Certification Notice
3.  Scheduling Order
4.  Order Granting Continuance
5.  Order Resetting Case for Hearing to Amend Scheduling Order
6.  Amended Scheduling Order
7.  Second Order Granting Continuance
8.  Second Amended Scheduling Order
9.  Order Granting Third Continuance and Amended Scheduling Order
10. Fourth Order Granting Continuance

---

[5] The Court advised Mr. McBride's counsel that it would not accept duplicate medical records contained in exhibit 2 to Dr. Chung's deposition and instructed counsel to remove any duplicates and resubmit exhibit 2 by the next day. Mr. McBride's counsel did not resubmit the records. Thus, the Court excluded the duplicate records of the treating physicians.

11. Order Resetting Scheduling Hearing
12. Motion to Withdraw as Employee's Counsel
13. Status Order and Order Setting Hearing on Motion to Withdraw
14. Order Granting Motion to Withdraw
15. Status Hearing Order
16. Amended Scheduling Order
17. Employer's Pre-Hearing Brief
18. Employer's Witness and Exhibit List
19. Employee's Witness and Exhibit List
20. Pre-Compensation Hearing Statement
21. Dispute Certification Notice (post-discovery)

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on March 8, 2021.

| Name | Via Email | Service sent to: |
|------|-----------|------------------|
| Christopher Taylor, Employee's Attorney | X | ctaylor@taylortoon.com sreynolds@taylortoon.com |
| Allen Grant, Employer's Attorney | X | agrant@eraclides.com |

*Penny Shrum*
_____
**Penny Shrum, Court Clerk**
Court of Workers' Compensation Claims